<u>FOR PUBLICATION</u>

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                            :        Chapter 13
In re:                                                      :
                                                            :        Case No. 13-37533 (cgm)
        Klaus and Linda Wimmer,                             :
                                                            :
                                Debtor(s).                  :
                                                            :
------------------------------------------------------------X

**MEMORANDUM DECISION DENYING CONFIRMATION AND DISMISSING CASE**


<u>A P P E A R A N C E S</u> :

Brian McCaffrey, Esq.
Brian McCaffrey Attorney At Law, P.C
88-18 Sutphin Blvd
1st Floor
Jamaica, NY 11435
*Attorney for Debtors*

James J. Rufo, Esq.
McCabe, Weisberg & Conway P.C.
145 Huguenot Street, Suite 210
New Rochelle, NY 10801
*Attorney for OneWest Bank, FSB*

**CECELIA G. MORRIS**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

        Chapter 13 Debtors filed a motion to avoid liens, heard in conjunction with confirmation

of the Debtors' chapter 13 plan, that sought to bifurcate and cram down a first mortgage while

avoiding a wholly unsecured second mortgage.  Debtors proposed to pay the contractual rate of

interest rather than the rate of interest prescribed in *Till v. SCS Credit Corp.*, 541 U.S. 465

(2004).  Debtors sought to pay the value of the collateral over the remaining contract term rather

than the applicable commitment period of the chapter 13 plan.  Debtors also sought a

determination from the Court that the unsecured portions of the liens should not count toward the

chapter 13 debt limit due to a prior chapter 7 discharge.  The Court denies confirmation of the

Debtors' chapter 13 plan for failure to properly treat the secured claim of the first mortgage.  The

Court also dismisses the case for exceeding the debt limit.

## Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. §

157(a), and the Amended Standing Order of Reference signed by Chief Judge Loretta A. Preska

dated January 31, 2012.  This is a "core proceeding" under 28 U.S.C. §§ 157(b)(2)(A) (matters

concerning administration of the estate), 157(b)(2)(B) (allowance of claims against the estate),

and 157(b)(2)(L) (confirmation of plans).

## Background

Klaus and Linda Wimmer ("Debtors") filed this chapter 13 case on November 19, 2013.

Vol. Pet., ECF No. 1.  In their petition, the Debtors listed their street address as 12 Blueberry Hill

Road in Hopewell Junction, New York (the "Blueberry Hill Property").  *Id.* at 1.  In the Debtors'

Schedule A, which was filed on December 17, 2013, the Debtors listed the Blueberry Hill

Property as their only real property.  Scheds. 3, ECF No. 8.  The Blueberry Hill Property is

allegedly encumbered by a first mortgage in the amount of $1,223,033.54 in favor of OneWest

Bank, FSB ("Creditor").  Conf. Obj. 1, ECF No. 25.  Creditor also purportedly holds a second

mortgage against the property in the amount of $153,981.81.  Mot. 5, ECF No. 18.

On January 6, 2014, the Debtors filed an amended petition and amended schedules.  Am.

Scheds., ECF No. 11.  The Debtors' amended petition lists their street address as 747 North

Quaker Hill Road in Pawling, New York (the "Quaker Hill Property").  *Id.* at 1.  The Debtors'

Schedule A does not list an interest in the Quaker Hill Property.  *Id.* at 10.  In response to

Question 15 of the Debtors' Statement of Financial Affairs (requesting prior addresses within

three years of the petition date), the Debtors listed the Blueberry Hill Property as a prior address. *Id.* at 32. The column where the Debtors are asked to fill in the dates of occupancy of the Blueberry Hill Property is left blank. *Id.*

A. Motion to value collateral and bifurcate claims.

On January 31, 2014, the Debtors filed a motion to determine that the value of the Blueberry Hill Property is $545,000 pursuant to an appraisal dated October 11, 2013. Mot. 5, ECF No. 18. With this valuation, the Debtors seek to: (i) bifurcate the first mortgage into a secured claim for $545,000 and an unsecured claim for the remainder; (ii) avoid the lien securing the unsecured portion of the first mortgage; (iii) reclassify the junior mortgage to an unsecured claim; and (iv) avoid the lien securing the junior mortgage. *Id.* at 5–8. The motion contends that the bifurcation of the first mortgage claim is not prohibited by the anti-modification provisions of § 1322(b)(2),[1] as the Debtors no longer claim the Blueberry Hill Property as their principal residence. *Id.* at 6.

The motion states that the Debtors fell behind on their mortgage payments on the Blueberry Hill Property and Creditor initiated foreclosure. *Id.* at 4. The motion alleges that Creditor engaged in misconduct in the foreclosure proceeding, stating:

> Throughout the course of settlement conferences in the state court action the Creditor refused to consider the Debtor[s] for loss mitigation because the amount owed to the Creditor exceeded the loan limits for loss mitigation programs available through [Creditor].

> As a result of the intransigence of [Creditor], the Debtor[s] sought to find a place to live that would afford [them] a lower monthly payment for rent, while enabling [them] to rent the [Blueberry Hill] Property to someone who could afford the payment amount dictated by the mortgage. In September 2013 the Debtor[s] . . . took up residence at 747 North Quaker Hill Road, Pawling, NY 12564.

---

[1] Unless otherwise noted, all sectional references are to the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (2012).

*Id.* The motion does not specify what interest, if any, the debtors have in the Quaker Hill Property. *See id.*

Debtors attach what appears to be a full interior appraisal of the Blueberry Hill Property conducted on October 11, 2013. Mot. Ex. A, ECF No. 18.

### B. Creditor's first opposition papers.

On March 11, 2014, Creditor filed opposition to the motion. Opp'n, ECF No. 29. Creditor raised two issues in its initial opposition. *Id.* at 3–5. Creditor claims that § 1322(b)(2) and *In re Pond*, 252 F.3d 122 (2d Cir. 2001) ("*Pond*") allow the Debtors to modify claims secured by a debtor's principal residence and not investment property, and since the Debtors no longer live at the Blueberry Hill Property, they may not modify Creditor's secured claims. *Id.* at 3–4. Creditor also alleges that the Debtors' chapter 13 plan is not feasible, which Creditor believes to be fatal to the motion. *Id.* at 4. Creditor believes that if the Debtors bifurcate the first mortgage claim, the Debtors will be required to pay the secured portion over the 60-month life of the chapter 13 plan while paying the Creditor interest in accordance with *Till v. SCS Credit Corp.*, 541 U.S. 465 (2004) ("*Till*"). *Id.* According to Creditor, this will result in a payment of $10,994.13 per month. *Id.* at 5. Creditor points to the Debtors' Schedule I, which shows gross monthly income of $10,792.08, to demonstrate that the Debtors cannot make the required payment. *Id.*

### C. Prior case.

On June 7, 2012, Mr. Wimmer filed a chapter 7 bankruptcy individually (Case No. 12-36464). Vol. Pet., *In re Wimmer*, No. 12-36464-cgm (Bankr. S.D.N.Y. June 7, 2012),[2] ECF No. 1. He received a discharge on September 7, 2012. Order D'chg 1, chapter 7 case, ECF No. 9. Creditor was listed as a secured creditor on the petition and mailing matrix; Vol. Pet. 12, 45,

---

[2] Mr. Wimmer's chapter 7 case will be hereinafter short cited as "chapter 7 case."

chapter 7 case, ECF No. 1; was mailed notice of the 341 meeting; Not. 341 Mtg. 3, chapter 7 case, ECF No. 5; and was mailed notice of the discharge; Order D'chg 3, chapter 7 case, ECF No. 9.

The promissory note and mortgage for both the first and second mortgages are only signed by Mr. Wimmer.  Opp'n Ex. A, at 7, 24, ECF No. 29 (first mortgage); Proof of Claim Ex., at 16, Claim Reg. 1-1 (second mortgage).

D.  Debtors' second motion.

Debtors filed a second motion.  2d Mot., ECF No. 36.  This motion objects to claim 14-1, which is the first mortgage secured claim of Creditor.  *Id.* at 3.  Debtors seek complete reclassification of claim 1-1 to zero and reclassification of claim 14-1 as a secured claim of $545,000 (based on the appraisal) and an unsecured claim of $678,033.54.  *Id.* at 5.

In the second motion, the Debtors also argue that Mr. Wimmer's prior chapter 7 discharge renders the unsecured portions of the potentially avoided liens unenforceable.  *Id.* at 4.

E.  Debtors' reply to Creditor's opposition.

Debtors also filed a reply to Creditor's opposition to the first motion.  Reply, ECF No. 38.  As to the second mortgage, Debtors argue that *Pond* and *Nobelman v. Am. Sav. Bank*, 508 U.S. 324 (1993) ("*Nobelman*") do not prohibit bifurcation and reclassification of claims secured by investment property, and only speak to liens against the debtor's principal residence.  *Id.* at 3.

As to the first mortgage, Debtors argue that they can de-accelerate the loan while paying the value of the collateral over a term that is longer than the duration of the five-year chapter 13 plan.  *Id.* at 5–6.  Debtors seek to continue the remaining duration of the note (270 months), pay only the $545,000 value of the property, and pay the contract rate of interest.  *Id.* at 8–11.

Debtors reiterate their argument that the unsecured portion of the loans should be deemed void due to the prior chapter 7 discharge. *Id.* at 12–15. Debtors argue that disallowance would mean that the debt does not count towards the debt limit of § 109. Under § 109(e), "[o]nly an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $383,175 and noncontingent, liquidated, secured debts of less than $1,149,525" can be a debtor under chapter 13. The debt limits apply equally to married couples filing jointly. 11 U.S.C. § 109(e). With these two motions, Debtors seek a total reclassification of $832,015.35 to unsecured, which exceeds the unsecured debt limit by nearly double. Consequently, Debtors seek a Court determination that these portions do not count towards the debt limit. Rep. 12, ECF No. 38. Otherwise, by prevailing on these motions, the Debtors would render themselves ineligible for chapter 13.

F. Creditor's additional response.

Creditor put forth additional briefing in support of its opposition. Cr. Rep., ECF No. 46. Creditor asserts that the Blueberry Hill Property is actually the Debtors' principal residence, meaning the first mortgage claim cannot be bifurcated. *Id.* at 5. According to Creditor, the mortgage described the property as a one or two family dwelling only. *Id.* at 9–10. Creditor also points out that the property is a one or two family dwelling according to the Dutchess County property classification, and was maintained as the Debtors' principal residence from October or November of 2006 until September of 2013. *Id.* Creditor also points out that Debtors sought to obtain a loan modification from Creditor during the foreclosure proceeding and was reviewed for a loan modification. *Id.* at 10. Based on these facts, Creditor argues that the Debtors entered into the loan agreement with the intent to make the Blueberry Hill property their primary residence. *Id.*

In the event the Court finds this to be investment property, the Creditor believes it must be paid the secured portion of its claim in full over the life of the chapter 13 plan with *Till* interest. *Id.* Creditor argues that the 270-month repayment proposed by the Debtors exceeds the 60-month applicable commitment period for the chapter 13 plan. *Id.* at 12. According to Creditor, the current prime rate is 3.25% and a risk adjustment of 3% is appropriate given Mr. Wimmer's prior chapter 7 filing, which indicates he is a credit risk. *Id.* If paid over the life of the plan, the total monthly payment, assuming a *Till* interest rate of 6.25%, would be $11,340.59 per month. *Id.* at 12–13. Creditor asserts that the plan is entirely infeasible where Debtors' gross monthly income on the petition is $10,792.08 per month. *Id.* at 13.

G. <u>Creditor's objection to confirmation.</u>

Creditor also objects to confirmation of the Debtors' plan on the grounds that the plan does not propose to repay any arrears on account of the first mortgage, and on the grounds that the Creditor objects to the motion to avoid liens. Obj. Conf. 1, ECF No. 25. Arrears are allegedly $207,990.03. *Id.*

**<u>Discussion</u>**

**I. Matters relevant to the motions to avoid liens.**

For the reasons set forth below, the Court dismisses the case, thereby mooting the motions to avoid liens. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 239–241 (1937). Nonetheless, two issues were raised in the papers that merit some discussion.

I. <u>Liens may still be avoided where the property is not a principal residence.</u>

Creditor contends that § 1322(b)(2) and *Pond* only allow the Debtors to avoid liens against their principal residence, not against investment property. Creditor misreads the law. Section 1322(b) states that a chapter 13 plan may, among other things, "modify the rights of

holders of secured claims, other than a claim secured only by a security interest in real property that is the debtor's principal residence . . . ."

The "anti-modification" exception of § 1322(b)(2) prohibits the debtors from modifying certain secured claims against their principal residence. *Nobelman*, 508 U.S. at 328. However, there is no restriction on the debtor's ability to "modify the rights" of holders whose claims are not secured by a principal residence. *See In re Moore*, 441 B.R. 732, 741 (Bankr. N.D.N.Y. 2010) (allowing "strip down" of mortgage lien against investment property).

This is consistent with *Pond*. In that case, the Second Circuit held that a debtor could avoid a junior mortgage holder's liens. *Id.* at 127. The Second Circuit held that creditors holding an entirely underwater lien against a debtor's principal residence "are not 'holders of . . . a claim secured only by a security interest in . . . the [plaintiffs'] principal residence,' and, therefore, their rights in the lien are not protected under the anti-modification exception of § 1322(b)(2)." *Id.*

The same is true here. Creditor is not the holder of a "claim secured only by a security interest in real property that is the debtor's principal residence." 11 U.S.C. § 1322(b)(2). Creditor's "rights in [its] lien are not protected by the anti-modification exception of § 1322(b)(2)" and may be modified. *Pond*, 252 F.2d at 127; *see also Moore*, 441 B.R. at 741.

II.     The liens may still be avoided if the plan is infeasible.

Creditor next contends that the motion should be denied as the Debtors have not proposed a feasible plan for confirmation. Creditor's opposition is based on Debtors' insufficient income to propose a confirmable plan that will pay the full amount of Creditor's secured claim plus interest over the life of the plan. Presumably, Creditor objects to the avoidance of its lien in the event that the Debtors' chapter 13 plan is not confirmed.

Proof that the debtor will ultimately be able to confirm a plan is not required before the Court may entertain a motion to avoid a lien. "[T]he proper mechanic to value the mortgage lien under § 506(a) in chapter 13 cases is to bring a motion pursuant to Rules 3012, 9013, and 9014." *In re Miller*, 462 B.R. 421, 433 (Bankr. E.D.N.Y. 2011). Rule 3012 states that "[t]he court may determine the value of a claim secured by a lien on property in which the estate has an interest on motion of any party in interest and after a hearing on notice to the holder of the secured claim . . . ." Fed. R. Bankr. P. 3012. Debtors have brought such a motion. There is no prerequisite that the Court determine the feasibility of the plan.

If Creditor is correct that the debtors' plan is unconfirmable, its lien will be reinstated. Failure to confirm a plan will lead to dismissal or conversion of the case. 11 U.S.C. § 1307(c)(5). Upon dismissal, the liens will be restored. *In re Wapshare*, 492 B.R. 211, 217 (Bankr. S.D.N.Y. 2013) (citing *TD Bank, N.A. v. Davis (In re Davis)*, 716 F.3d 331, 338 (4th Cir. 2013)); 11 U.S.C. § 349(b)(1)(C).

**II.    Confirmation of the Debtors' chapter 13 plan is denied.**

A.   Debtors cannot cure and maintain payments while also electing cram down.

Section 1325 sets forth the requirements for chapter 13 plan confirmation. One of the provisions, § 1325(a)(5), provides three options for dealing with a secured claim. The plan can provide for surrender of the collateral that secures the claim, provide a treatment the creditor will accept, or pay the claim in an amount "not less than the allowed amount of such claim." *In re Morales*, 506 B.R. 213, 217–18 (Bankr. S.D.N.Y. 2014) (citing *Assocs. Commercial Corp. v. Rash,* 520 U.S. 953, 956–57 (1997)). The "allowed amount of such claim" under § 1325(a)(5)(B) is defined with reference to § 506(a), which provides, in relevant part:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest . . . is a secured claim to the extent of the value of such creditor's

> interest in the estate's interest in such property . . . and is an unsecured claim to
> the extent that the value of such creditor's interest or the amount so subject to
> setoff is less than the amount of such allowed claim.

11 U.S.C. § 506(a); *see also Rash*, 520 U.S. at 956–57.  When the plan utilizes § 506(a)
and § 1325(a)(5)(B),

> the debtor is permitted to keep the property over the objection of the creditor; the
> creditor retains the lien securing the claim, see § 1325(a)(5)(B)(i), and the debtor
> is required to provide the creditor with payments, over the life of the plan, that
> will total the present value of the allowed secured claim, *i.e.,* the present value of
> the collateral, see § 1325(a)(5)(B)(ii). The value of the allowed secured claim is
> governed by § 506(a) of the Code.

*Id.* at 957.

The duration of a chapter 13 plan is defined by reference to the "applicable commitment period" of § 1322(d) and § 1325(b)(4).  Sections 1322(d) and 1325(b)(4) both provide that plans may be three or five years.  If the debtor's current monthly income, when multiplied by 12, is less than the median income of the state for a family of the debtor's family's size, the applicable commitment period is three years.  11 U.S.C. § 1325(b)(4)(A)(i).  If the debtor's household income is greater than the state median, the applicable commitment period is "not less than 5 years . . . ."  11 U.S.C. § 1325(b)(4)(A)(ii).  In either case, "the court may not approve a period that is longer than 5 years."  11 U.S.C. § 1322(d).

When combined with § 1325(a)(5)(B), the applicable commitment period of §§ 1322(d) and 1325(b)(4) appears to mandate that the debtor pay the entire amount of all secured claims over a maximum of five years.  This result would make it impossible for many chapter 13 debtors to retain their homes.  The debtor would be forced to pay the entire balance of their home mortgage over five years regardless of the remaining term of the note.

The solution lies in § 1322(b)(5), which states that the plan may

> notwithstanding paragraph (2) of this subsection, provide for the curing of any
> default within a reasonable time and maintenance of payments while the case is

> pending on any unsecured claim or secured claim on which the last payment is
> due after the date on which the final payment under the plan is due . . . .

Under § 1322(b)(5), the plan may cure arrears on account of a secured claim, such as a home

mortgage, through the chapter 13 plan.  Aside from curing the default through the plan, the

debtor also maintains the contractual monthly payment.  11 U.S.C. § 1322(b)(5).  Section

1322(e) expressly excludes the § 506(a) valuation from the calculation of the amount necessary

to cure the default under § 1322(b)(5), and mandates that the cure amount be determined in

accordance with the applicable agreement and nonbankruptcy law.  Moreover, § 1322(b)(5)

expressly states that the debtor can cure and maintain "notwithstanding paragraph (2) of this

subsection," meaning that the anti-modification provision is not violated where the debtor seeks

to cure and maintain a loan secured in his or her principal residence.  "The effect of 1322(b)(2)

and (5) is to potentially split the treatment of mortgagee's secured claim by the plan—one

secured claim for the mortgage going forward and one secured claim for the arrearage—but it

does not compromise the amount of the aggregate secured claim or the rights of the secured

creditor to recover the arrearage."  *Universal Am. Mortg. Co. v. Bateman (In re Bateman),* 331

F.3d 821, 826 n. 5 (11th Cir. 2003) (citing *Nobelman*, 508 U.S. at 331–32).

Where the claim is allegedly secured in investment property, cram down is not prohibited

by the antimodification provision, and the debtor also has the ability to cure and maintain.  The

issue presented in this case is whether the debtor can use both in the same plan.

In *In re Tavella*, 191 B.R. 637 (Bankr. E.D. Pa. 1996), the debtor owned several parcels

of real property and proposed to modify the interest rate on the mortgages securing them.  *Id.* at

638.  The debtor also proposed that the contractual interest rates would be reinstated upon

completion of the plan.  *Id.* at 639.  The court found that "[i]n the cramdown scenario, a Chapter

13 plan must provide that the secured creditor receive the present value of his secured claim

within the life of the plan, or else an objection to confirmation must be sustained." *Id.* at 640.

The court looked to section 1322(b)(5) and found it inapplicable due to the modification of

interest rate. *Id.* The court stated plainly that "[u]nder [section] 1322(b)(5), all of the provisions

of a note or contract remain in full force and effect." *Id.* (citations omitted). According to the

court, "[a] change in the monthly payments does not constitute the 'maintenance of payments'

for these purposes." *Id.* (citations omitted).

The same reasoning has been followed in this Circuit. In *In re Koper*, 284 B.R. 747, 756

(Bankr. D. Conn. 2002), the court found that a plan that did not pay the balance of bifurcated

mortgage claims in full during the plan had "no license under the Bankruptcy Code." The court

noted that "[a] secured claim that is modified by a plan is plainly 'provided for' by that plan, as

contemplated by section 1325(a)(5). Consequently, in order for such a plan to be confirmed, it

must provide for payment thereunder of the present value of any such modified secured claim."

*Id.* at 752 (citing 11 U.S.C. § 1325(a)(5)(B)(ii)).

Recently, the court in *In re Bullard*, 494 B.R. 92 (B.A.P. 1st Cir. 2013) added an

additional point to the analysis, noting that § 1325(a)(5)(B)(i)(I) requires that the creditor retain

the lien until the earlier of payment of the "underlying debt determined under nonbankruptcy

law" or discharge. *Id.* at 100. The underlying debt is distinct from the bifurcated claim amount,

as an "allowed secured claim" is a bankruptcy concept. *Id.* Section 1328(a)(1) excepts debts

"provided for" under § 1325(b)(5) from discharge. If the debtor could cram down and maintain

the term of the note, there would be no discharge of the debt by virtue of § 1328(a)(1), and no

payment of the underlying debt by virtue of the cram down. *Id.* Section 1325(a)(5)(B)(i)(I)

would be rendered a nullity. *Id.*

The Court agrees with the foregoing cases and finds that the Debtors cannot cram down a secured claim while also maintaining the repayment term of the original contract. The Debtors have made no provision for the secured claim in the amended plan, making the plan unconfirmable as it stands. *See* 11 U.S.C. § 1325(a)(5). Confirmation is denied, and the request to utilize both §§ 1325(a)(5)(B)(ii) and 1322(b)(5) is denied.

B. Debtors must pay *Till* interest.

If utilizing § 1325(a)(5)(B)(ii), the debtor must pay "the value, as of the effective date of the plan" of the allowed amount of the secured claim. As noted above, the secured claim is determined with reference to § 506(a). "In *Till,* a pre-BAPCPA case, the Supreme Court addressed the appropriate method for determining the interest rate on the secured portion of a claim that was bifurcated under section 506." *In re Velez*, 431 B.R. 567, 571 (Bankr. S.D.N.Y. 2010). In *Till*, the Court decided that a formulaic approach to determining the cram down interest rate is appropriate, and established the national risk-free prime rate plus an additional risk adjustment rate as the proper calculation. *Id.* (citing *Till*, 541 U.S. at 479). Since *Till*, "courts generally have approved a risk adjustment rate of 1% to 3%." *Velez*, 431 B.R. at 571 (citing *In re Martinez,* 409 B.R. 35, 40 (Bankr. S.D.N.Y. 2009)).

Debtors propose to use the contractual interest rate that varies from the *Till* rate. This treatment was rejected in *Chrysler Fin. Co., LLC v. Taranto (In re Taranto)*, 365 B.R. 85 (B.A.P. 6th Cir. 2007). In *Taranto*, the debtors proposed to pay the contractual 0% interest on account of a bifurcated secured claim, arguing that *Till* interest would provide a windfall to the creditor. *Id.* at 90. The court found that the required "value" in § 1325(a)(5)(B)(ii) meant, under *Till*, that "interest *must* be paid to achieve the present value of the claim." *Id.* at 90 (emphasis in original) (citing *Till*, 541 U.S. at 474).

The Court agrees with the analysis in *Taranto*.  "The requirement that the 'value' of the property to be distributed be determined 'as of the effective date of the plan' incorporates the principle of the time value of money." *Till*, 541 U.S. at 486–87.  The Creditor is entitled to the "value" of the claim under § 506(a), which the Supreme Court has defined as the present value of the collateral using the prime interest rate plus a risk premium. *Id.* at 487.  The entitlement to interest flows from § 506(a) and the time value of money, not the contract. *Taranto*, 365 B.R. at 90; *see also Rake v. Wade,* 508 U.S. 464, 472 n. 8 (1993) ("When a claim is paid off pursuant to a stream of future payments, a creditor receives the 'present value' of its claim only if the total amount of the deferred payments includes the amount of the underlying claim plus an appropriate amount of interest to compensate the creditor for the decreased value of the claim caused by the delayed payments.").  Otherwise, the "value" of the collateral is not paid. *Till*, 541 U.S. at 486–87.

In deciding the appropriate risk adjustment, the court should consider "evidence included in the debtor's bankruptcy filings, such as work history, job stability, cash flow, disposable income, the existence or absence of prior bankruptcy filings, and the contents of the Chapter 13 plan." *In re Martinez*, 409 B.R. 35, 41 (Bankr. S.D.N.Y. 2009) (quoting *In re Bivens,* 317 B.R. 755, 764 (Bankr. N.D. Ill. 2004)).  A 3% risk adjustment would be appropriate in this case.  Even without interest, the monthly payment would be $9,083.33.  Debtors show monthly income of $10,792.08 on Schedule I.  Am. Scheds. 24, ECF No. 11.  The cram down payment would comprise a significant portion of the Debtors' income, especially with interest.  The risk of default here is substantial.

In any event, the proposed plan provides for no payments on account of the secured claim. Confirmation is denied. The request to set an interest rate other than the *Till* rate is denied.

### III. Debtors' case is dismissed due to ineligibility for chapter 13 relief.

Debtors ask the Court to determine that the potential deficiency claims of the Creditor are not part of the "debt limit" of § 109(e). Section 109(e) provides

> Only an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $383,175 and noncontingent, liquidated, secured debts of less than $1,149,525, or an individual with regular income and such individual's spouse, except a stockbroker or a commodity broker, that owe, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts that aggregate less than $383,175 and noncontingent, liquidated, secured debts of less than $1,149,525 may be a debtor under chapter 13 of this title.

Also relevant is § 101(12), which defines "debt" as "liability on a claim." Claim is a broad term, defined in § 101(5)(A) to be a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

This case is a "chapter 20" bankruptcy in which the debtor files a chapter 7, receives a chapter 7 discharge, and then files a subsequent chapter 13. Where a chapter 7 discharge was issued within four years of the debtor's chapter 13 petition date, § 1328(f)(1) renders the debtor ineligible for a chapter 13 discharge. While this provision eliminates a significant motivation for filing a chapter 13 case, the debtor can still utilize the chapter 13 plan to, among other things, avoid liens. *See, e.g., In re Wapshare*, 492 B.R. 211, 214–15 (Bankr. S.D.N.Y. 2013) ("The Court finds that the plain language of the Bankruptcy Code does not prohibit the use of § 1322(b)(2) in a chapter 20 case, and the Court is bound to follow the Second Circuit's decision in *Pond* . . . .") (citations omitted).

Mr. Wimmer's personal liability to Creditor was discharged in the chapter 7 case. 11 U.S.C. § 727(b); *Johnson v. Home State Bank*, 501 U.S. 78, 80 (1991). Mrs. Wimmer has no personal liability to Creditor for these claims as she did not sign either note. *See generally In re Rutledge*, 208 B.R. 624, 627 (Bankr. E.D.N.Y. 1997); *In re Smith*, 469 B.R. 198 (Bankr. S.D.N.Y. 2012); *In re Cady*, 440 B.R. 16 (Bankr. N.D.N.Y. 2010); *Smith v. Fitzsimmons*, 584 N.Y.S.2d 692, 695 (App. Div. 1992) (4th Dep't) ("As a general rule, privity or its equivalent remains the predicate for imposing liability for nonperformance of contractual obligations.").

The issue is whether the unsecured portions of these liens count towards the debt limit despite unenforceability against the Debtors personally. The Court concludes that those portions must be included in the calculation.

A.  <u>The underwater portions of the liens are unsecured claims despite the chapter 7 discharge.</u>

Notwithstanding Mr. Wimmer's discharge, the Creditor still holds a bankruptcy claim for the unsecured deficiency. The Court agrees with the reasoning in *In re Miller*, 462 B.R. 421, 431 (Bankr. E.D.N.Y. 2011):

> This treatment of an unsecured mortgage debt as an unsecured claim, even though the debtor has no personal liability, is consistent with the Supreme Court's decision in *Johnson v. Home State Bank,* 501 U.S. 78, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991), which held that a mortgage lien for which the debtor no longer has personal liability as the result of a chapter 7 discharge is a claim as defined under the Bankruptcy Code, and is a claim which may be treated in a chapter 13 plan.

Under *Johnson*, the *in rem* rights of the Creditor against the property create a secured claim in the bankruptcy case notwithstanding the discharge of personal liability. 501 U.S. at 84.

Secured claims are also valued pursuant to § 506(a), which only leaves only two possible results: a secured portion to the extent of the value of the collateral and an unsecured portion to the extent of the deficiency. There is no provision in § 506(a) to eliminate a portion of the claim

altogether.  Based on this reading of § 506(a) and the Supreme Court's decision in *Johnson*, the

Court concludes that the Creditor holds unsecured claims for its mortgage deficiencies.  *See*

*Wapshare*, 492 B.R. at 218 (reclassification of a wholly underwater junior mortgage claim to an

unsecured claim was appropriate in chapter 20 case).

> B.  Unsecured portions of liens count towards the debt limit in chapter 13 cases where
> there is not a prior chapter 7 discharge.

In the ordinary chapter 13 case, where there is no prior chapter 7 discharge during the

four years preceding the petition date, the unsecured portions of avoided liens count towards the

debt limit even if the claims were originally filed as secured.  *See Scovis v. Henrichsen (In re*

*Scovis)*, 249 F.3d 975, 983 (9th Cir. 2001) ("Through the inclusion of a § 506(a) analysis to

define "secured" and "unsecured" in the § 109(e) context, a vast majority of courts, and all

circuit courts that have considered the issue, have held that the unsecured portion of

undersecured debt is counted as unsecured for § 109(e) eligibility purposes.") (collecting cases).

The reason is that "[i]t is patently unfair for the debtor to be permitted to treat a claim as

unsecured for the purposes of distribution . . . and yet treat the same claim as fully secured for

the purpose of evading the unsecured debt limitation of § 109(e)."  *In re Prosper*, 168 B.R. 274,

280 (Bankr. D. Conn. 1994); *see also In re Rifkin*, 124 B.R. 626, 629 (Bankr. E.D.N.Y. 1991)

("The majority view is preferable since it avoids elevation of form over substance.").

> C.  The chapter 7 discharge does not remove the deficiency claims from the eligibility
> analysis.

The issue is whether the chapter 7 discharge affects the analysis under § 109(e) by

rendering the now-unenforceable unsecured portions irrelevant.  The analysis must begin with

the language of § 109(e).  *U. S. v. Ron Pair Enters., Inc.,* 489 U.S. 235, 241 (1989) ("The task of

resolving the dispute over the meaning of [a statute] begins where all such inquiries must begin:

with the language of the statute itself."). Section 109(e) applies to "debts" that the individual

"owes." "Debt" is defined in § 101(12) to mean "liability on a claim." At first glance, this

definition would seem to indicate that the debtor must have "liability on" the claim for there to

be a "debt," liability that would have been extinguished by the chapter 7 discharge. There are

two problems with this interpretation. First, nothing in § 101(12) indicates that "liability" is the

same as the "personal liability" of the debtor. As illustrated in *Johnson*, collateral may be liable

*in rem* for a claim even if the debtor is not. 501 U.S. at 80. Section 524(a), governing the effect

of discharge, confirms this suspicion. Under § 524(a)(1), a discharge "voids any judgment . . . to

the extent that such judgment is a determination of the personal liability of the debtor . . . ."

Section 524(a)(2) similarly provides that the discharge "operates as an injunction against the

commencement or continuation of an action . . . to collect . . . any such debt as a personal

liability of the debtor . . . ." Both provisions provide that the discharge affects the "personal

liability" of the debtor, whereas § 101(12) only references the broader term "liability." The

result is that some form of liability, presumably *in rem* liability, can remain after "personal

liability" is discharged. Similarly, § 524(f) provides that the discharge does not prevent the

debtor from voluntarily repaying any "debt." The implication is that a "debt" can survive

discharge and be voluntarily repaid.

Second, the legislative history to § 101(12) makes clear that the word "debt" is merely a

different way to say "claim." The House and Senate Reports state that "the terms are

coextensive: a creditor has a 'Claim' against the debtor; the debtor owes a 'Debt' to the

creditor." H.R. Rep. No. 95-595, at 310 (1977); S. Rep. No. 95-989, at 23 (1978). While the

court should look to the text of a statute first and foremost, legislative history can be used to

"shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous

terms." *Exxon Mobil Corp. v. Allapattah Svcs., Inc.,* 545 U.S. 546, 568–69 (2005).  In this instance, the legislative history is helpful to confirm that the term "debt" in § 109(e) should not be interpreted to have any significance other than another way of saying "claim."  *See Darby Bank & Trust v. Grenchik (In re Genchik)*, 386 B.R. 915, 917 (Bankr. S.D. Ga. 2007) (looking to the legislative history and finding that "debt" and "claim" can be used interchangeably in the § 109(e) context).

Another possible interpretation is that the debt is not "owed" under § 109(e) by virtue of the discharge.  At least one court has reached this conclusion.  *Peoples Bank v. Winder (In re Winder)*, 171 B.R. 728, 731 n. 5 (Bankr. D. Conn. 1994).  This Court believes that such a reading does not comport with "decades of jurisprudence on the subject of bankruptcy discharge [that place] it beyond cavil that discharge does not extinguish the debt, but only the remedy . . . ." *In re Bruno*, 356 B.R. 89, 92 (Bankr. W.D.N.Y. 2006).  "It is true, of course, that a bankruptcy discharge does not send a debt into the equivalent of *1984*'s 'memory hole.'" *Torres v. Chase Bank USA, N.A. (In re Torres)*, 367 B.R. 478, 487 (Bankr. S.D.N.Y. 2007); *see also Irby v. Fashion Bug (In re Irby)*, 337 B.R. 293, 295 (Bankr. N.D. Ohio 2005) ("The effect of a creditor being legally enjoined from pursuing recourse against a debtor will, in large percentage of instances, forever bar the creditor from seeing payment on their debt; thus, such creditor will be provided scant comfort in the knowledge that, from a legal standpoint, their debt remains technically in existence.").

The case *In re Dabrowski*, 257 B.R. 394 (Bankr. S.D.N.Y. 2001) illustrates the difference between discharging a debt and its elimination.  The debtor in *Dabrowski* received a discharge of prepetition outstanding rents.  *Id.* at 410–11.  While the landlord could not "recover the obligation from the discharged debtor," the discharge "did not extinguish the underlying debt."

*Id.* at 413.  The landlord was free to "avail herself of the *consequences* of the nonpayment of the

rental, and of the fact that the unpaid rent obligation was not extinguished, so long as she does

not attempt to recover the unpaid rent."  *Id.* (emphasis in original).

The debt is still "owed" notwithstanding the discharge; it is merely unrecoverable from

the debtor personally.  If it is not paid, the landlord (or, as in this case, the secured lender) can

exercise other state law remedies.  *See In re Scotto-DiClemente*, 463 B.R. 308, 314 (Bankr.

D.N.J. 2012), *aff'd*, 2012 U.S. Dist. LEXIS 113799 (D.N.J. Aug. 13, 2012) ("[W]hen a creditor

possesses a claim against a debtor, that debtor owes a debt to the creditor.").

This does not mean that every debt discharged in chapter 7 will count towards the debt

limit in a subsequent chapter 20 case.  To be a "debt" for purposes of § 109(e), there must be a

"claim."  11 U.S.C. § 101(12).  Here, the secured debts constitute "claims" by virtue of the

*Johnson* decision, as they are enforceable against property of the estate.  501 U.S. at 84.  If the

debts were originally unsecured and discharged in the chapter 7, there would be neither in rem

enforceability nor enforceability against the Debtors.  This would render the claims disallowable

under § 502(b)(1).

In reaching the same conclusion, the bankruptcy court in *Scotto-DiClemente* also focused

on the *in rem* nature of discharged secured claims.  The court stated that

> the U.S. Supreme Court in *Johnson, supra,* reaffirmed that the undischarged *in
> rem* claim remaining after a Chapter 7 discharge is subject to the treatment in a
> subsequent Chapter 13 case. As a result, the Court must also include the
> unsecured *in rem* claim when determining a debtor's eligibility for relief under §
> 109(e).

*Id.* at 570–71.

The Court disagrees with the case cited by Debtors, *Cavaliere v. Sapir*, 208 B.R. 784 (D.

Conn. 1997).  That case held that a chapter 7 discharge rendered the unsecured portion of

avoided liens unenforceable against the debtor and therefore disallowed under § 502(b)(1).  *Id.* at

786.  In support, the *Cavaliere* court cited *Liona Corp., Inc. v. PCH Assoc. (In re PCH Assoc.)*,

949 F.2d 585, 604 (2d Cir. 1991), which held that the unsecured portion of a non-recourse debt

constitutes a disallowed unsecured claim.  *Id.*  As noted above, the Court believes that the

*Johnson* case and § 506(a) mandate that the deficiency claims be treated as unsecured claims

notwithstanding the chapter 7 discharge of the debtor's personal liability.  *See In re Diclemente*,

2012 U.S. Dist. LEXIS 113799, at *13 (D.N.J. Aug. 13, 2012) ("This Court agrees with the

Bankruptcy Court's analysis and also 'takes issue with the conclusions reached in Shenas [*In re

Shenas*, 2011 Bankr. LEXIS 2907 (Bankr. N.D. Cal. July 28, 2011)] and Cavaliere, wherein the

courts summarily posited that the surviving *in rem* claims are not enforceable under § 506(a).'")

(quoting *Scotto-DiClemente*, 463 B.R. at 312)).

    D.  Dismissal is appropriate.

    Section 1307(c) provides that the court may dismiss or convert a chapter 13 case "for

cause" upon request of a "party in interest."  Section 1307(c) also requires "notice and a

hearing."  Notwithstanding the request, notice, and hearing requirements in § 1307(c), courts

have held that § 105(a) empowers the court to dismiss a case sua sponte if the debtor is ineligible

for relief.  *In re Moore*, 2012 WL 1192776, at *4 (Bankr. N.D.N.Y. Apr. 10, 2012) (citing

*Hammers v. IRS (In re Hammers),* 988 F.2d 32, 34–35 (5th Cir. 1993); *Kestell v. Kestell (In re*

*Kestell),* 99 F.3d 146, 149 (4th Cir. 1996)).

    Section 105(a), which allows the court to "issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of this title," was recently construed by the

Supreme Court in *Law v. Siegel*, ___ U.S. ___, 134 S. Ct. 1188 (2014).  The Court found that "in

exercising those statutory and inherent powers, a bankruptcy court may not contravene specific

statutory provisions." *Id.* at 1194.  The Court noted that it would be impossible to "carry out"

the provisions of the Bankruptcy Code by contravening an express provision.  *Id.*  This Court has

also consistently held that the use of § 105(a) is only appropriate where "necessary to preserve an

identifiable right conferred elsewhere in the Bankruptcy Code."  *In re Schuessler*, 386 B.R. 458,

492 (Bankr. S.D.N.Y. 2008) (quoting *Jamo v. Katahdin Fed. Credit Union (In re Jamo)*, 283

F.3d 392, 403 (1st Cir. 2002)).

   The Court does not believe that sua sponte dismissal for non-eligibility contravenes the

request, notice, and hearing requirements in § 1307(c), as the Court does not believe that reliance

on § 1307(c) is necessary.  Dismissal can be accomplished through §§ 109(e) and 105(a) without

§ 1307(c).  Sections 1307(c) and 109(e) deal with different scenarios.  Section 1307(c) "sets out

the standard ('cause') that a bankruptcy court must apply in deciding whether, in its discretion,

an already filed Chapter 13 case should be dismissed or converted to Chapter 7."  *Marrama v.

Citizens Bank of Mass.*, 549 U.S. 365, 380 (2007).  Section 1307(c) sets forth several examples

of cause, none of which include ineligibility to be a debtor.  All of the examples deal with

conduct taking place after the case is filed.  The § 109(e) determination, however, is made "on

the date of filing of the petition."  *In re Pearson*, 773 F.2d 751, 757 (6th Cir. 1985).  Its purpose

is to "ensure that the excess monthly incomes of Chapter 13 debtors [are] not wildly out of

proportion to the debts they seek to repay."  *In re Brown*, 7 B.R. 529, 532 (Bankr. S.D.N.Y.

1980).  Its original role was that of "gatekeeper, determining which proprietors was small enough

to reorganize under Chapter 13 and which had to file for Chapter 11 relief, where they would

have to comply with more exacting requirements."  *In re Rios*, 476 B.R. 685, 688 (Bankr. D.

Mass. 2012) (citing H.R. Rep. No. 95-595, at 119 (1977)).  Given this gatekeeper function, it

makes little sense to tie § 109(e) to § 1307(c).  "The matter of eligibility is one that must be

determined at the outset." *In re Marrama*, 345 B.R. 458, 473 (Bankr. D. Mass. 2006) (citing *In re Berenato,* 226 B.R. 819, 823 (Bankr. E.D. Pa. 1998)).  Sua sponte dismissal may be appropriate to "preserve the use of . . . resources to cases involving debtors eligible to file under [chapter 13]." *Berenato*, 226 B.R. at 823.  The requirements of § 1307(c) are not contravened by sua sponte dismissal pursuant to §§ 105(a) and 109(e), and the principals laid out in *Law v. Siegal* are not infringed.

The uncontroverted valuation in this case shows that the Blueberry Hill Property is worth $545,000.  If it is not a principal residence, and is therefore subject to bifurcation under § 506(a), the unsecured portion is $678,033.54.  This exceeds the unsecured debt limit.  If it is a principal residence, the uncontested secured claim is $1,223,033.54, which exceeds the secured debt limit.  Under either scenario, the Debtors are ineligible for chapter 13, and judicial resources would be preserved by dismissal of the case.

## Conclusion

For the foregoing reasons, the Court denies confirmation and dismisses the case.  The Creditor should submit an order consistent with this decision.

Dated: Poughkeepsie, New York
      June 30, 2014               /s/ Cecelia G. Morris               .
                                    CECELIA G. MORRIS
                                    CHIEF UNITED STATES BANKRUPTCY JUDGE